IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 25, 2022 Session

## CHARLES HYATT v. ADENUS GROUP, LLC ET AL.

**Appeal from the Chancery Court for Williamson County**
**No. 2019-CV-48635          Joseph A. Woodruff, Judge**

———————————————————

**No. M2021-00645-COA-R3-CV**

———————————————————

The trial court reformed an agreement between an employer and employee regarding the employee's right to a profit share upon termination of his employment. We affirm the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed and Remanded**

J. STEVEN STAFFORD, P J., W.S., delivered the opinion of the court, in which ANDY D. BENNETT and W. NEAL MCBRAYER, JJ., joined.

H. Rowan Leathers, III and Alexandra Ortiz Hadley, Nashville, Tennessee, for the appellant, Adenus Group, LLC.

Brett R. Carter, Nashville, Tennessee, for the appellee, Charles Hyatt.

## OPINION

### FACTUAL AND PROCEDURAL HISTORY

Plaintiff/Appellee Charles Hyatt ("Appellee" or "Mr. Hyatt") was the Chief Executive Officer of Defendant/Appellant Adenus Group, LLC ("Appellant" or "Adenus" or "the company") from November 2007 until he was given notice in late 2018 that his employment contract would not be renewed beyond December 31, 2018. Adenus is a wastewater services company owned by four brothers ("the brothers"): Thomas Pickney ("Tom"), Charles Pickney ("Charles"), William Pickney ("Bill"), and Robert Pickney ("Robert"),[1] who also comprise the Board of Directors of Adenus ("the board"). When

_____

[1] Because the brothers share the same last name, we will refer to them by their first names. No

Appellee was hired, the company was in financial trouble, and Appellee helped navigate the company through some of those difficulties. By all accounts, the working relationship between the brothers and Appellee was amicable, and Adenus only chose to terminate Appellee's employment because of the different "direction that the board wanted to go." At the time Appellee's employment was terminated, Charles was no longer a board member or owner of Adenus, but had sold his share to his three brothers. After receiving notice that his employment contract would not be renewed, Appellee attempted to exercise the sale of what he asserted was his accumulated profit share in the company.

When he did not receive the payment he claimed he was owed for his profit share, Appellee filed a complaint against Adenus and the brothers in the Williamson County Chancery Court (the "trial court") on August 19, 2019. He sought declaratory judgment that he was the owner of a fully vested 10% profit interest in Adenus and had the right to require Adenus to repurchase his profit interest, and that Adenus was required to comply with his repurchase demand. He also alleged counts of breach of contract, breach of fiduciary duty, unjust enrichment, conversion, fraud in the inducement, negligent misrepresentation, and tortious interference with contract. He sought damages in excess of $300,000.00, punitive damages, pre- and post-judgment interest, costs and attorney's fees, and an accounting regarding the value of the profit interest. Appellee then filed an amended complaint on July 31, 2020, pursuant to an agreed order, removing his claim for fraud in the inducement and adding a claim for reformation of the parties' agreement with respect to the profit share, and enforcement of the reformed agreement.

A bench trial occurred in the trial court from April 12 to April 14, 2021. Appellee, Charles, Bill, and Mike Hallum, an accountant for Adenus, testified.[2] Appellee testified that he made $115,000.00 per year at Adenus and did not receive a raise until 2017, when his salary increased to $150,000.00 per year (though his raise was not memorialized in a written agreement). Pursuant to Appellee's Employment Agreement, his initial term of employment was three years. Appellee's employment would automatically renew for a one-year term if Adenus did not notify him otherwise at least ninety days before the expiration of his Employment Agreement. Appellee's employment thus continued until he received notice on October 1, 2018 that his employment contract would not be renewed. The parties agree that the termination of Appellee's employment was a "Termination by Expiration" under the terms of the Employment Agreement, meaning it was a "termination

---

disrespect is intended.

[2] In addition, the record consists of the brothers' depositions. It appears from our review of the trial transcript that only certain portions of each deposition were intended to be introduced in evidence, including some portions that were read into the record at trial. While it is not entirely clear which other portions of the depositions were supposed to be entered in evidence, certain parts of the depositions in the record are highlighted. Therefore, we conclude that only those portions of the depositions that are highlighted were entered in evidence, and so those are the only portions we have considered. Thus, when we refer to witness testimony, it either came from live trial testimony or portions of the depositions that were entered in evidence.

of Officer as a result of the expiration of the Term of this [Employment] Agreement without extension by the Company and Officer."

In the "Additional Benefits" section of Appellee's Employment Agreement, it states, in pertinent part,

> To induce the Officer to undertake the employment evidenced by this Agreement, the Company agrees to offer a Profit Sharing Award per the Company's 2008 Equity Incentive Plan ["the Plan"]. The terms of the Agreement will be set forth in a separate document ["the Profit Sharing Award Agreement," or "the Award Agreement"], to be executed within thirty (30) days of the execution of this Agreement.

Appellee testified that he was not involved in reviewing the Plan or the Award Agreement until after late June 2008, and he did not have prior experience with such agreements. Appellee testified that after a meeting of the board on February 15, 2008, Adenus involved a lawyer, Todd Ervin, to draft the Plan and the Award Agreement. Mr. Ervin emailed versions of the Award Agreement and the Plan to Charles and Appellee on March 26, 2008, after which, according to Appellee, Charles primarily took over the process of finalizing those agreements on behalf of Adenus.[3]

Charles emailed Appellee versions of the Award Agreements for Appellee and Glenn Marcum[4] on June 27, 2008. These documents, which Appellee testified he believes Charles drafted, differed from Mr. Ervin's initial draft. In part, the version of the Award Agreement that Mr. Ervin had emailed to Charles and Appellee on March 26, 2008 included a "sale option," whereby if an employee was terminated under certain circumstances, he would have the option to require the Company to purchase his vested profit units, subject to certain conditions. In the versions that Charles sent to Appellee on June 27, the "sale option" had been removed. Charles also then emailed Appellee a version of the Plan on June 30, 2008. Appellee made revisions to the Award Agreement and the Plan and emailed them back to Charles, Robert, and Mr. Marcum on June 30, 2008. In the body of the email, Appellee wrote, "Review the docs. I used [Mr. Marcum's] agreement as the markup. Once we all agree on the language, I will adjust [Mr. Marcum's] to reflect my vesting dates."[5]

---

[3] The remaining brothers—Bill, Robert, and Tom—all testified similarly that they were not very involved in developing the Award Agreement and the Plan. Instead, Charles was in charge of that.

[4] When Appellee joined Adenus, Mr. Marcum was both a board member and served as executive-level personnel there, running the Adenus Solutions Group. Mr. Marcum subsequently left the company.

[5] The vesting schedule applicable to Mr. Marcum's profit share was different than Appellee's because Mr. Marcum had been at Adenus longer. Appellee marked up the version of the Award Agreement containing Mr. Marcum's vesting schedule, which otherwise appears to be the same as the version of the Award Agreement applicable to Appellee that Charles sent via email on June 30.

The Plan that Appellee sent to Charles, Robert, and Mr. Marcum on June 30 ("Appellee's Plan") stated in relevant part as follows:

This 2008 Equity Incentive Plan has been adopted by Adenus Group, LLC (the "Company") pursuant to the Amended and Restated Operating Agreement for the Company dated as of January 1, 2008 (the "Agreement"). Capitalized terms used herein but not otherwise defined shall have the respective meanings set forth in the Agreement. [6]

This Plan permits the issuance of Profit Shares . . . to eligible employees, consultants and non-employee Board members of the Company.

The purpose of the Plan is to provide financial incentives for selected employees, consultants and non-employee Board members of the Company, thereby promoting the long-term growth and financial success of the Company by (a) attracting and retaining the most qualified employees, consultants and non-employee Board members, (b) strengthening the Company's capability to develop, maintain and direct a competent management team, (c) providing an effective means for selected employees, consultants and non-employee Board members to acquire and maintain ownership of the Company's equity and participate in future profits, (d) motivating employees to achieve long-range performance goals and objectives, and (e) providing incentive compensation opportunities competitive with those of other organizations.

1. **Definitions**. The following terms shall have the meanings set forth below:

"Award" means a Profit Share or Membership Interest granted hereunder.

"Award Agreement" means the written agreement setting forth the terms and conditions applicable to each Award granted under the Plan.

\*       \*       \*

"Disposition Event" means an event when the Company has sold all or substantially all of its assets.

\*       \*       \*

---

[6] It is not clear if the binding version of Adenus' Operating Agreement is in the appellate record. The parties do not appear to rely on the Operating Agreement in making their arguments, and thus we will not consider it.

- 4 -

"Fair Market Value" has the meaning set forth in Section 5.2(b) and Exhibit C[7] of the Agreement.

\* \* \*

"Plan" means the Adenus Group, LLC 2008 Equity Incentive Plan.
"Profit Share" means the right to share in certain profits of the Company under this Plan in accordance with the terms and conditions of Section 4 below.

"Repurchase Option" means the right for the Company to purchase all or a portion of the vested Profit Share from the Service Terminated Member.

"Sale Option" means the option for an Employee Member who's [*sic*] Service Termination is for Good Reason, has [*sic*] the right to require the Company to purchase all or portion of his vested Profit Share.

\* \* \*

"Subsidiary Entity(ies)" means any or all of the following: Adenus Solutions Group, LLC, Adenus Technologies, LLC, Adenus Utilities, LLC, Adenus Operations, LLC, Adenus Capacity, LLC.

\* \* \*

**3. Participation**. . . . In the event of any inconsistency between the provisions of the Plan and any Award Agreement, the provisions of the Plan shall govern. . . .

**4. Grant of Profit Shares.** Subject to the terms and conditions of the Agreement and the Plan, the Committee may grant Profit Shares to Participants. Each Profit Share granted under the Plan shall be evidenced by an Award Agreement. The Award Agreement shall incorporate and conform to the conditions set forth in this Section as well as such other terms and conditions that are not inconsistent with the Agreement and the Plan as the Committee may consider appropriate.

(a) Rights of Profit Shares. A Profit Share shall be expressed as a percentage ("Profit Share Percentage") and shall entitle its holder to a share of the profits realized by the Company upon the sale of all or substantially all of its assets, determined as follows:

---

[7] It appears that Exhibit C is a "Fair Market Value Formula" prepared by Mr. Hallum.

Profit Share = Profit Share Percentage multiplied by the excess of the proceeds received by the Company upon such a sale over the Fair Market Value of the Company at the effective time that the Profit Share was granted to the holder thereof.

(b) <u>Profit Share Percentage</u>. Each Award Agreement shall specify the Profit Share Percentage awarded to the Participant and the terms and conditions thereof as determined by the Committee.

\*   \*   \*

(f) <u>Forfeiture</u>. If a Participant who is granted a Profit Share ceases to provide Services to the Company or its Subsidiary Entities for any reason whatsoever, such Participant shall forfeit his unvested Profit Share without further action by or additional consideration from the Company.

The revisions that Appellee had made to the version of the Plan that Charles had sent him on June 30, before sending Appellee's Plan back to Charles, Robert, and Mr. Marcum on June 30, included the following: adding the definitions of "Disposition event," "Repurchase option," and "Sale option"; adding "Adenus Capacity, LLC" to the list of entities in the definition of "Subsidiary Entitiy(ies)"; and adding the word "unvested" to the Forfeiture provision.

A version of the Plan with Charles's handwritten notes on it that is substantially similar to Appellee's Plan was also introduced in evidence ("the marked-up Plan"). At the top of the marked-up Plan, it states, "Document Revisions – since Board Approval on June 17, 2008." It also says, in the top right corner, an illegible word and "7-15-08," which Charles testified appeared to have originally said "6-15-08," but the "6" was changed to a "7":

Rovotrent 7-15-08

Document Revisions –
since Board Approval on June 17, 2008

**ADENUS GROUP, LLC**
**2008 EQUITY INCENTIVE PLAN**

**Dated January 1, 2008**

In the Definitions section of the marked-up Plan, it further has "Add" handwritten next to "Disposition Event," "Repurchase Option," and "Sale Option," which are defined the same as they are in Appellee's Plan, *supra*:

- 6 -

**"Disposition Event"** means an event when the Company has sold all or substantially all of its assets.

**"Profit Share"** means the right to share in certain profits of the Company under this Plan in accordance with the terms and conditions of Section 4 below.

**"Repurchase Option"** means the right for the Company to purchase all or a portion of the vested Profit Share from the Service Terminated Member.

**"Sale Option"** means the option for an Employee Member who's Service Termination is for Good Reason, has the right to require the Company to purchase all or portion of his vested Profit Share.

Additionally, in both the marked-up Plan and Appellee's Plan, "Adenus Capacity, LLC" appears in the list of "Subsidiary Entity(ies)"—but in the marked-up Plan, "Add Adenus Capacity" is handwritten to the left of "Subsidiary Entity(ies)."

**"Subsidiary Entity(ies)"** means any or all of the following: Adenus Solutions Group, LLC, Adenus Technologies, LLC, Adenus Utilities, LLC, Adenus Operations, LLC, <u>Adenus Capacity, LLC</u>.

The marked-up Plan also has "Revised Wording" in handwriting next to "Exchange Act":

**"Exchange Act"** means the Securities Exchange Act of 1934, as it may be amended from time to time.

**"Fair Market Value"** means the value of the Company as determined by the formula set forth in <u>Exhibit C</u> of the Agreement.

According to Appellee, the "Revised Wording" note next to "Exchange Act" was actually meant to apply to the definition of "Fair Market Value." Indeed, the definition of "Fair Market Value" in the marked-up Plan is slightly different from the definition of "Fair Market Value" in Appellee's Plan, *supra*.

Finally, the marked-up Plan has a handwritten scribble through the word "unvested" in the "Forfeiture" section, with "Revised Wording" handwritten to the left:

(f) **Forfeiture.** If a Participant who is granted a Profit Share ceases to provide Services to the Company or its Subsidiary Entities for any reason whatsoever, such Participant shall forfeit his ~~unvested~~ Profit Share without further action by or additional consideration from the Company.

In testifying, Charles seemed unsure of where the marked-up Plan came from—he thought it may have been a working document based on meetings that had occurred, including a board meeting on June 17, 2008. He also said that he would not put a lot of credence in his notes, but that he would put credence in the board meeting minutes, which

he kept in his capacity as Chairman of the Board. Minutes from a board meeting on July 15, 2008 were introduced in evidence. They stated, with respect to the Plan, as follows:

> The next item was the approval of changes to the Adenus Group, LLC 2008 Equity Incentive Plan. Charles Pickney reviewed the changes, which included a definition of "Disposition Event," a revised wording of fair market value, and the addition of Adenus Capacity to the subsidiary entities and in item 4F (for figure) removed the word unvested.
>
> Robert Pickney made a motion that the equity incentive plan approved at the June 17th 2008 board meeting be replaced with the new Equity Incentive Plan as presented and corrected. William Pickney seconded the Motion, and it was approved unanimously.

At trial, Charles acknowledged that there was "somewhat" a correlation between these board meeting minutes and his handwritten notes on the marked-up Plan. Appellee also testified that he was at this July 15 board meeting, and that contrary to the minutes, the board did not approve a Plan on June 17, 2008, instead deferring it to the following meeting (but the board did approve a new Operating Agreement on June 17, 2008). He testified that on or about July 15, 2008, he also marked through "unvested" in the "Forfeiture" section of the Plan in his files, which was consistent with the board meeting minutes and the marked-up Plan.

Ultimately, the parties agreed that the controlling version of the Plan is the same as the marked-up Plan. But up until trial, Adenus had maintained that the controlling version of the Plan was one that: (1) did not include definitions of "Disposition Event," "Repurchase Option," or "Sale Option"; (2) had a different definition of "Fair Market Value"; (3) and did not include "Adenus Capacity, LLC" in the list of "Subsidiary Entities."

As for the Award Agreement, after sending an initial revised version to Charles, Robert, and Mr. Marcum on June 30, Appellee then sent another draft to Charles on July 1, 2008 ("the July 1 version") via email. In that email, Appellee wrote, "I made the changes to paragraph (e) on the FMV. Let me know if any additional changes need to be made." The July 1 version of the Award Agreement states, in relevant part, as follows:

> 1.      AGREEMENT TO BE BOUND BY PLAN. The Employee [Appellee] has received, read and understands this Agreement and the Adenus Group, LLC 2008 Equity Incentive Plan, as new or hereinafter in effect (the "Plan") and has bad ample opportunity to consult with his legal, tax or other advisers prior to signing this Agreement. This Agreement is subject to and shall be construed in accordance with the terms and conditions of the Plan. Any capitalized terms that are used in this Agreement without being defined and that are defined in the Plan shall have the meaning

specified in the Plan. The Employee is bound by all of the terms and provisions of this Agreement and the Plan; *provided, however*, that in the event of any inconsistency between the terms of this Agreement and the Plan, the terms of the Plan shall govern.

2.  GRANT OF PROFIT SHARE. Subject to the terms and conditions contained in this Agreement and the Plan, the Company hereby issues to the Employee, and the Employee hereby accepts from the Company, a Profit Share in the Company, as set forth below:

| | |
|---|---|
| Date of Grant: | January 1, 2008 |
| Percentage: | 10 |
| Purchase price: | FMV as of December 31, 2007 |
| Voting Rights: | No |

3.  VESTING. The Profit Share issued by the Company to the Employee pursuant to this Agreement shall be subject to vesting as provided herein. The Employee shall be entitled to receive payment with respect to his Profit Share under Section 4(a) of the Plan only for that portion of his Profit Share that is vested.

(a)  At the effective date of this Agreement the employee has a vested profit sharing percentage of 2%. The remaining 8% of Profit Share issued hereunder shall vest at the rate of 1/6 of a percent per month for a period of 48 months provided the Employee is in Continuous Service.[8] For purposes of this Agreement, the term "Continuous Service" means that the Employee's provision of substantial service to or for the benefit of the Company or its Subsidiary Entities is not interrupted or terminated. . . .

(b)  If the Employee Member ceases Continuous Service for any reason, or no reason, with or without Cause ("Service Termination"), then:

(i)  The Employee Member will forfeit such Employee Member's entire unvested Profit Share. . . .

(ii)  The Company will have an irrevocable, exclusive option for a period of six (6) months from the date of Service

_____

[8] The preceding two sentences detail Mr. Marcum's vesting schedule, as opposed to Appellee's vesting schedule. *See* footnote 5, *supra.*

Termination to purchase all or any portion of the vested Profit Share held by the Employee Member (the "Repurchase Option"), in accordance with subsection (e) below.

(iii)    If the Service Termination is for Good Reason, the Employee Member will have an option for a period of six (6) months from the date of Service Termination to require the Company to purchase all or any portion of his vested Profit Share (the "Sale Option"), in accordance with subsection (e) below.

(c)    Immediately prior to a sale described in Section 4(a) of the Plan (a "Disposition Event"), one-half (1/2) of that portion of the Profit Share then held by the Employee that is then unvested shall vest. If the Employee is terminated without Cause by the Company and a Disposition Event occurs within twelve (12) months of the termination, the Employee shall be entitled to receive the amount (without duplication) equal to the distribution(s) he would have received with respect to any forfeited Profit Share had he been employed at the time of the Disposition Event. For such purposes, "Cause" shall mean, unless otherwise expressly defined in an employment or other agreement between the Company and the Employee, a willful failure to perform the Employee's duties, insubordination, breach of any material obligation of nondisclosure or noncompetition owed to the Company and its Subsidiary Entities, theft, acts of dishonesty, conviction of a felony or any other willful conduct that is materially detrimental to the Company or its Subsidiary Entities.

(d)    In the event of the Employee Member's termination of Continuous Service due to his death or disability prior to the last Profit Share Vesting Date, the Company will consider the date of Continuous Service as the last day of the month of the Member's death or disability. The remaining unvested Profit Share will be forfeited and will become the general assets of the Company and will be allocated among the then-existing Members in proportion to their Percentage Interest at that time (calculated without regard to the Profit Share forfeited by the Employee Member).

(e)    In the event of a termination of Continuous Service, the Company may pay the Employee Member the "Profit Share" either in cash or with the Company's note. The "Profit Share" will be valued based on the previous December 31st "Fair Market Value" or the most current "Fair Market Value". If the Company's [sic] issues its note to the Employee Member, the note shall be payable over three years in equal monthly installments, shall bear simple interest at a rate equal to the interest rate on

[U.S. Treasury bills as existing on January 1 of each year], and such note shall be payable upon a Disposition Event if such event occurs prior to the final installment.

\* \* \*

5.  GENERAL PROVISIONS.

\* \* \*

(b)  *Interpretation*. The interpretations and constructions of any provision of and determinations on any question arising under this Agreement shall be made by the Board of Directors of the Company, and all such interpretations, constructions and determinations shall be final and conclusive as to all parties. This Agreement constitutes the entire agreement between the parties pertaining to the subject matter hereof and supersedes all prior and contemporaneous agreements, representations and understandings. The invalidity or enforceability of any prevision hereof shall in no way affect the validity or enforceability of any other provision hereof. This Agreement may be executed in counterparts, all of which shall be deemed to be one and the same instrument, and it shall be sufficient for each party to have executed at least one, but not necessarily the same, counterpart. The headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement in any way.

(c)  *Costs of Enforcement*. In any action at law or in equity to enforce any of the provisions or rights under this Agreement, the unsuccessful party of such litigation, as determined by any court of competent jurisdiction in a final judgment or decree, shall pay the successful party or parties all costs, expenses and reasonable attorneys' fees incurred therein by such party or parties (including without limitation such costs, expenses and fees on any appeals), and if such successful party shall recover judgment in any action or proceeding, such costs, expenses and attorneys' fees shall be included as part of the judgment.

The changes to the Award Agreement between the versions Charles sent Appellee on June 30 and the July 1 version included the addition of sections (b) (including the sale and repurchase options), (d), and (e). Appellee testified at trial that he did not recall any additional emails, discussions, or meetings after his July 1, 2008 email to Charles with the July 1 version attached—nor are any such emails in the record. He also could not recall if he had a meeting with Charles specifically about the modifications to section 3(b) in the Award Agreement.

Nevertheless, the version of the Award Agreement that Appellee and Charles ultimately signed on July 15, 2008 ("the signed version" or "the executed version"), was not the same as the July 1 version.[9] Besides using Appellee's vesting schedule instead of Mr. Marcum's,[10] the signed version included the following differences from the July 1 version, as indicated by italics:

2.      GRANT OF PROFIT SHARE. . . .

Date of Grant:                          January 1, 2008

Percentage:                            10

Purchase price:                        *$0.00*

Voting Rights:                         No

*Fair Market Value*                    *December 31, 2007 calculated per exhibit (C).*

3.      VESTING. . . .
(b)      If the Employee Member ceases Continuous Service for any reason, or no reason, with or without Cause ("Service Termination"), then:

(i)      The Employee Member will forfeit such Employee Member's entire *vested and unvested* Profit Share.

The signed version also did not include sections 3(b)(ii) or (iii), 3(d), or 3(e), contrary to the July 1 version. Charles testified that he did not add subsections (3)(b)(ii) and (iii) (the repurchase and sale options), but could not say whether they had been intentionally or mistakenly deleted in the signed version. He testified, however, that subsections (3)(b)(ii) and (iii) were not consistent with what the company would have agreed to, and that he "c[ould]n't imagine [he and Appellee] didn't talk about" the need to remove them from the July 1 version. Charles also stated that the emails in the record do not constitute the majority of his communications with Appellee, and were not their only communications.

---

[9] Bill claimed that he kept a copy of the Award Agreement—specifically, he said that he had "the one we -- it's the one we voted -- that was signed by [Charles and Appellee]." But because he did not produce it in discovery, the trial court disregarded his testimony regarding what the alleged copy said.

[10] Specifically, the signed version stated in section 3(a): "At the effective date of this Agreement the employee hereunder shall vest at the rate of 1/6 of a percent per month for a period of 60 months provided the Employee is in Continuous Service."

The board meeting minutes from July 15, 2008 state as follows, with respect to the Award Agreement:

> The next item of business was to approve a profit interest award agreement for Glenn Marcum and Charles Hyatt. Charles Pickney reviewed modifications that were driven by tax issues. Charles Hyatt stated that any equity ownership prior to a sale event had adverse tax consequences. Charles Hyatt stated that the timing of a sale event could adversely effect [*sic*] him if the sale occurred significantly after his contract was ended if it is not renewed. His expected equity compensation would be lost. He added that although he had concerns about that situation, he was willing to accept the Profit Interest Award Agreement that had been presented to him if the board approved the offer.[11]
>
> Robert Pickney made a motion that Board approve the Profit Interest Award Agreements for Glenn Marcum and Charles Hyatt with the understanding that they would have 30 days to reply to the offer. Bill Pickney seconded the motion. A vote was taken, and it was approved unanimously.

Appellee testified that he signed the executed version of the Award Agreement without reviewing it, thinking, based on his email communications on June 30 and July 1 and what occurred at the July 15 board meeting, that it was not different than the July 1 version. He testified that his understanding was that if his employment ended before he served sixty months, i.e., before his profit share fully vested, he would lose any and all profit share. He said that if he could have lost the profit share after sixty months—i.e., after he had fully vested—it would not be an incentive, as was its purpose. Thus, he testified that he thinks he signed the wrong document—that an incorrect, prior version was printed out and he signed the signature page. He said, "The [signed] [A]ward [A]greement did not reflect the changes that the board approved relative to the [P]lan. And the [P]lan was the controlling factor."

Charles denied providing the wrong version of the Award Agreement for Appellee's signature on July 15, 2008. He did admit, however, that his "memory of this whole deal [wa]s not all that great." He described the situation involving these agreements as having been "kind of a confused mess," stating that during the time the Award Agreement and Plan were being negotiated, "[the brothers] were up to our eyeballs in alligators." He had to take the lead on negotiating and drafting the documents because Adenus could not afford a lawyer. But he explained that the intent of the Plan was to reward employees who had a vested profit share by giving them proceeds from the sale of Adenus. And, at the time the

---

[11] Appellant cites to some of Appellee's statements from these board meeting minutes in a conclusory manner, but provides little explanation as to what Appellee meant by these statements or how they should be interpreted to undermine Appellee's position on appeal. Therefore, we will not tax the length of this Opinion by attempting to interpret the meaning of these statements by Appellee.

Plan and Award Agreement were being negotiated, Charles's understanding and expectation was that Adenus was going to be sold, even though that never ultimately materialized. He testified that the intent had shifted away from having some type of profit sharing award involving a sale option, because it had become clear that would not be feasible given the financial state of the company. Therefore, he explained that the language regarding the repurchase and sale options was legacy language that was not intended to be applicable to the final agreements. He testified that the signed version of the Award Agreement accurately states the parties' deal and was consistent with the Plan, and it is the version of the Award Agreement that the board approved at the July 15, 2008 board meeting. He answered "no" when asked, "Would you have presented this profit share award agreement [the signed version] to the board for approval if you had any question that it did not contain and embody what the parties had agreed on?"

According to Appellee, when Tom notified him that he was not going to be retained, he asked Tom about the equity he had accumulated in the company, and Tom said, "We'll do what's right." Appellee sent a letter to Tom on October 1, 2018, which stated in part as follows:

> Due to the notification that the company, Adenus Group L.L.C., desires not to renew my contract on the basis of "going in a new direction", I had notified you that I have accumulated earned undistributed profit share at the end of 2017 in the amount of $254,043.00. You provided me no direct answer as to when I was going to receive that distribution. I expect to receive that distribution within ten (10) days of receipt of this letter at the address listed below.

> In addition, I expect the 2018 profit share to be distributed prior to April 15, 2019 as my contract ends on December 31, 2018.

After receiving no response, Appellee sent a follow up letter on October 21, 2018, stating in part that his ten percent profit interest in Adenus was "fully vested." The October 21 letter went on to state:

> In my letter dated October 1, 2018, I raised this issue to your attention based on our previous discussions related to the buyout or liquidation of that interest which would facilitate a complete parting of the ways between Adenus Group and me. It was my understanding from our conversations that this was your intent, so I would like to further those discussions.

After the trial, the trial court entered a Memorandum and Order on May 14, 2021, which made the following findings, in pertinent part:

- 14 -

The purpose of the Plan, among others, was to attract and retain qualified employees, to allow select employees to participate in future profits, to motivate employees to achieve long-range performance goals and objectives of the Company, and to provide incentive compensation opportunities competitive with other organizations. The parties intended that the Plan and the Award Agreement would be read, interpreted, and performed together. . . .

The sale option . . . allows the employee to require the Company to purchase an employee's vested profit share if the employee's employment with the Company was terminated . . . .

The repurchase option, on the other hand, . . . allowed the Company at its option to redeem an employee's vested profit share in the event that the employee's employment with the Company was terminated. Under either option, the Company was allowed flexibility to pay off the option payment in a lump sum or over three years with interest.

\* \* \*

There are no email communications from Charles Pickney to Mr. Hyatt following the July 1, 2008 email, communicating any changes to the Plan or the Award Agreement. Moreover, neither Mr. Hyatt nor Charles Pickney had any recollection of a meeting or other discussion that would have changed the Plan or the Award Agreement to remove the sale option or the repurchase option after Mr. Hyatt's July 1, 2008 email. Charles Pickney testified that he had no recollection of a discussion or a meeting where a decision was intentionally made to remove the Sale Option and repurchase option from the Award Agreement.

\* \* \*

The version of the Award Agreement approved by the Board included the sale option and the repurchase option. . . . If he did not complete the 60-month continuous service requirement of the vesting period, Mr. Hyatt would have forfeited the full profit share . . . .

\* \* \*

The Award Agreement also included a provision requiring the unsuccessful party in an action to enforce any of the provisions or rights under the Award Agreement to pay the successful party's costs, expenses,

- 15 -

and reasonable attorney fees to enforce provisions or rights under the Award Agreement.

Despite the negotiation of a Plan and Award Agreement that included a sale option and repurchase option, and the Board's express approval of the Plan which included the sale option and repurchase option, both Charles Pickney and Mr. Hyatt signed a version of the Award Agreement that did not include those critical terms. Indeed, the sale option and repurchase option were the only significant substantive changes to the Plan and Award Agreement negotiated by the parties after Charles Pickney provided the initial drafts to Mr. Hyatt on June 27 and June 30, 2008. The error of both the parties to recognize the omission of these critical terms was a mistake on the part of both Charles Pickney and Mr. Hyatt. Neither party discovered these omissions until following Mr. Hyatt's termination over ten years later in October 2018. . . .

The Court finds Mr. Hyatt credibly testified that after his July 1, 2008 email to Charles Pickney . . . there was no meeting, conversation, or email exchange between him and Charles Pickney or any other Board member that removed the sale and repurchase options. The record contains no documentary evidence of any objection being raised by Charles Pickney or any Board member to including the sale and repurchase options in the final version of the Award Agreement to be presented to the Board for approval.

The Court does not find the testimony of Bill Pickney on what terms were included in the final version of the Award Agreement credible.[12] Charles Pickney had no recollection of whether changes were intentionally made to the Award Agreement in July 2008 to remove the sale option and the repurchase option. The Board minutes of the July 15, 2008 meeting do not reflect such a decision. None of the other members of the Board remember removing the sale option or repurchase option from the Award Agreement prior to it being approved at the July 15, 2008 meeting. Mr. Hyatt was present at the Board meeting and the minutes do not reflect any discussion of the options.

\* \* \*

On October 1, 2018, Mr. Hyatt sent a letter to Adenus, indicating that he expected that his profit share would be distributed to him based on the termination of his Employment Agreement. On October 21, 2018, Mr. Hyatt

---

[12] This appears to be a reference to the failure to produce the copy of the Award Agreement that Bill stated he had kept. *See* footnote 9, *supra*.

- 16 -

sent a follow-up letter to Adenus to reiterate his intent that Adenus repurchase the profit share. This was a valid exercise of the sale option.

The value of Mr. Hyatt's 10% profit share as of December 31, 2018, the date of Mr. Hyatt's termination, was $298,372.39.

(Internal citations omitted).

In a footnote, the trial court also stated as follows:

Adenus' inability prior to trial correctly to identify the operative Plan lends circumstantial support to Mr. Hyatt's argument that the process of executing the definitive Award Agreement was plagued with administrative chaos culminating in the parties signing an incomplete preliminary draft rather than a complete version containing all of the terms and conditions approved by the Board.

The trial court went on to conclude, in relevant part:

There were essentially three questions to be resolved at trial:

1) Did the agreement between the parties include a sale option?

2) If the agreement included a sale option, did Mr. Hyatt exercise it, thus requiring Adenus to purchase his profit share in the Company at the fair market value as of December 31, 2018?

3) If the agreement did not include a sale option, did Mr. Hyatt forfeit his profit share when Adenus unilaterally terminated his employment as of December 2018?

The proof presented at trial established by clear and convincing evidence that (1) Adenus and Mr. Hyatt negotiated an agreement that included a sale option; (2) the Board approved the version of the Plan that included the sale option; (3) the version of the Award Agreement signed by the parties omitted the sale option; (4) Mr. Hyatt's testimony as well as the minutes from the July 15, 2008 Board meeting establish that the parties intended the sale option to be a part of the agreement between the parties; and (5) as a result of the parties' mutual mistake, the sale option was omitted from the signed Award Agreement. As a result, this Court should exercise its discretion to reform the Award Agreement to include the sale option thereby requiring the Company to purchase Mr. Hyatt's profit share at its fair market value as of December 31, 2018.

- 17 -

In any event, the vesting and forfeiture provisions in the Plan and the Award Agreement operate to preserve Mr. Hyatt's vested profit share in the Company after the term of his Employment Agreement expired. To construe the Plan and Award Agreement otherwise would be inconsistent with their overall purpose and intent. Moreover, construing the Plan and Award Agreements in the manner urged by Adenus would be inconsistent with controlling Tennessee law, including the principle of construction requiring that written agreements be construed "in pari materia" and in a manner to give effect to all material terms, and with the plain meaning and understanding of the terms and provisions that the parties used to determine whether and how Mr. Hyatt would fully vest in the profit share. Any other conclusion on this point would be unconscionable. Accordingly, the Court holds that on the undisputed facts Mr. Hyatt completed the continuous service vesting period in accordance with the term of the Award Agreement, and the expiration of his employment five years later does not operate as a forfeiture of his 10% profit share pursuant to the Plan.

*     *     *

Mr. Hyatt has proven by clear and convincing evidence:

a. <u>Prior Agreement</u> — That Mr. Hyatt and the Company agreed to a Profit Share Award Agreement that included a sale option based on Mr. Hyatt's June 30 and July 1 emails with his proposed changes to the Plan and Award Agreement and the Board's approval of the Plan and Award Agreement in a form that was substantially identical to the terms proposed by Mr. Hyatt.

Thus, the parties in this case had agreed that the Plan and the Award Agreement would include both a sale option and a repurchase option. This is further supported by the inherent interrelationship between the two documents that including the sale option and repurchase option in the Plan without including those terms in the Award Agreement would render those provisions without meaning and surplusage. Thus, due to the express interrelation of the Plan and the Award Agreement, the Court must assign significance to the inclusion of the sale option and repurchase option in the Plan and conclude that it was the intent of the parties that those terms be a part of the Award Agreement as well;

b. <u>Intent</u> — Through the same acts and conduct, it was the parties' intent that the sale option and repurchase option were intended to be included in the final Award Agreement that was signed by the parties;

c. Materiality — The omission of the sale option and the repurchase option from the final signed Award Agreement materially prejudices the parties because it leaves them both with no procedural means to liquidate or buy-out the other party in the event that Mr. Hyatt's employment was terminated once he fully vested in the profit share; and

d. No Gross Negligence — Mr. Hyatt's failure to catch this drafting error does not rise to the level of gross negligence. "[R]eformation is denied only in 'extreme cases' where party's fault 'amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing.'" *Sikora* [*v. Vanderploeg*], 212 S.W.3d [277,] 290 [(Tenn. Ct. App. 2006)] (citations omitted).

Mr. Hyatt has established that the omission of the sale option and repurchase option was a mutual mistake as both parties signed the Award Agreement without recognizing that those terms were omitted. Each party would have benefitted from the inclusion of these options — Mr. Hyatt through the sale option, and Adenus through the repurchase option. . . .

Based on the foregoing, the Court concludes that the Award Agreement should be reformed to include the sale option and the repurchase option. As reformed, the Award Agreement included both a sale option and repurchase option. By failing to purchase the profit share of Mr. Hyatt when Mr. Hyatt exercised the sale option in October 2018, Adenus breached the terms of the Plan and the Award Agreement. Accordingly, Mr. Hyatt should be awarded a judgment that Adenus is required under the terms of the Plan and the Award Agreement to purchase Mr. Hyatt's profit share.

The purchase price as calculated under the terms of the Plan and the Award Agreement is $298,372 plus applicable interest and other expenses.

(Footnotes and most internal citations omitted).

The trial court also awarded Appellee prejudgment interest, taking judicial notice of interest rates from December 2018 to present, and concluding "that Mr. Hyatt should be entitled an additional judgment in the amount of $36,053 representing prejudgment interest at 5.0% simple interest from January 1, 2019 to the date of entry of this Memorandum and Order." (Footnotes and internal citations omitted).

Moreover, the trial court concluded that in the alternative, if Appellee did not have the right to exercise the sale option, Appellee nevertheless "has a vested continuing 10% profit interest in Adenus that, pursuant to the terms of the Plan, will be due to be redeemed upon a disposition event/sale of the Company." The court reasoned, inter alia, that the

purposes of the Plan and Award Agreement were in part to reward senior management in the event of a sale of the Company. Therefore, the court concluded that because the forfeiture provision in the Award Agreement was only included in the part of the agreement dealing with the 60-month vesting period, Appellee would only forfeit his profit share if he did not maintain continuous service for the 60-month vesting period. The trial court also relied on Tennessee case law disfavoring forfeiture.

The trial court thus ultimately ordered that Appellee was "entitled to a declaratory judgment that his vested 10% profit share in Adenus Group, LLC was not involuntarily forfeited to Adenus Group, LLC upon the expiration of his employment with Adenus Group, LLC." Furthermore, the trial court ordered that Appellee was "awarded a judgment against Adenus Group, LLC in the sum of $334,425 representing the fair market value of his 10% profit share interest of $298,372 together with prejudgment interest at 5.0% simple interest since January 1, 2019 in the amount of $36,053." The trial court stated that "[s]atisfaction by Adenus Group, LLC of the foregoing judgment in the amount of $334,425 shall result in the complete redemption of Charles Hyatt's vested 10% profit share interest in Adenus Group, LLC." The trial court dismissed Appellee's complaints against the brothers individually, stating that it appeared that Appellee had abandoned them, and "[i]n any event, the proof at trial [did] not provide any basis for the Court to ignore Adenus' business form and impose personal liability against any of the named individual defendants."[13]

In addition, the trial court determined that Appellee was the successful party and contractually entitled to an award of reasonable attorney's fees, pursuant to the "prevailing party provision [of the Award Agreement]." The court determined, based on Appellee's attorney's affidavit and attached exhibits, that Appellee was entitled to a judgment of $89,105.00 in attorney's fees and court reporter expenses of $900.00. Finally, the trial court ordered that the foregoing judgments shall accrue post-judgment interest.

Appellant appealed.[14]

**ISSUES PRESENTED**

Appellant raises the following issues for review, taken from its brief:

---

[13] The claims against the brothers are not at issue in this appeal.

[14] Neither party specifically addresses the causes of action that Appellee brought in his amended complaint for breach of fiduciary duty, unjust enrichment, conversion, negligent misrepresentation, and tortious interference with contract. Thus, those appear to be alternative causes of action that Appellee has abandoned. Appellee also appears to have abandoned his request for punitive damages, which he does not mention on appeal.

1. Whether the trial court erroneously concluded that [Appellee] continued to own a profit share in Adenus after the termination of his Employment Agreement.

2. Whether the trial court erroneously exercised its equitable powers when it reformed the Profit Share Award Agreement and awarded [Appellee] $298,372.

## STANDARD OF REVIEW

Review of a trial court's findings of fact in a bench trial is de novo, "accompanied by a presumption of the correctness of the finding[s], unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d). Thus, we are required to defer to the trial court's fact-findings unless we "determin[e] that the aggregate weight of the evidence demonstrates that a finding of fact other than the one found by the trial court is more probably true." *Sikora v. Vanderploeg*, 212 S.W.3d 277, 285 (Tenn. Ct. App. 2006) (citation omitted). "The presumption of correctness in Tenn. R. App. P. 13(d) applies only to findings of fact, not to conclusions of law. Accordingly, appellate courts review a trial court's resolution of legal issues without a presumption of correctness and reach their own independent conclusions regarding these issues." *Id.* (citations omitted).

## DISCUSSION

### i.

Appellant argues that the executed version of the Award Agreement is clear and unambiguous and should be enforced as written, as with the Plan. Thus, the purpose of the profit share language was only to provide employees with proceeds from a sale of the company. And employees who were terminated in the manner that Appellee was terminated forfeited their entitlement to any profit share. In the alternative, Appellant contends that the trial court erred in valuing the share of profits to which Appellee was entitled. In contrast, Appellee argues that the trial court was correct to reform the contact because the executed agreement did not reflect what the parties negotiated and the board approved concerning the profit share due to employees. Appellee further asserts that the value of his interest when he was terminated was at least $298,372.00, and he met his burden of proving fair market value.

### ii.

Generally, "courts must interpret contracts as they are written and are not at liberty to make a new contract for parties who have spoken for themselves." *Sikora*, 212 S.W.3d at 286 (internal citations omitted). "Accordingly, the courts do not concern themselves with the wisdom or folly of a contract, and will not relieve parties from contractual obligations

simply because they later prove to be burdensome or unwise." *Id.* (internal citations and footnote omitted). "Nevertheless, the law's strong policy favoring the enforcement of contracts as written must occasionally give way. Thus, it is well settled that the courts have the power to alter the terms of a written contract where, at the time it was executed, both parties were operating under a mutual mistake of fact or law regarding a basic assumption underlying the bargain." *Id.* (citations omitted). As this Court has further explained:

> The judicial alteration of the provisions of a written agreement is an equitable remedy known as "reformation." *Greer v. J.T. Fargason Grocer Co.*, 168 Tenn. 242, 244–45, 77 S.W.2d 443, 443–44 (1935); *Tenn. Valley Iron & R.R. Co. v. Patterson*, 158 Tenn. 429, 433, 14 S.W.2d 726, 727 (1929). The basic purpose of reformation is to make the contract "conform to the real intention of the parties." *Lebo v. Green*, 221 Tenn. 301, 314, 426 S.W.2d 489, 494 (1968). It is "driven by a respect for the parties' intent and gives effect to the terms mutually agreed upon by the parties." 27 WILLISTON ON CONTRACTS § 70:2, at 210.

*Id.* at 287 (footnote omitted). "Reformation, being an equitable remedy, requires us to consider the equities of the parties." *Trent v. Mountain Com. Bank*, 606 S.W.3d 258, 263 (Tenn. 2020) (citing 27 Williston on Contracts § 70:24 (4th ed.) (July 2020 Update) (footnotes omitted) ("The court has equitable discretion to grant reformation if it finds that to be in the interests of justice. Since the remedy of reformation is equitable in nature, a court has the discretion to withhold it, even if it would otherwise be appropriate, on grounds that have traditionally justified courts of equity in withholding relief. The major limit to the traditional exercise of equitable discretion is reasonableness.")).

This Court has further explained what is necessary in order to procure reformation of a contract:

> Because the law strongly favors the validity of written instruments, a person seeking to reform a written contract must do more than prove a mistake by a preponderance of the evidence. Instead, the evidence of mistake must be clear and convincing. *Hazlett v. Bryant*, 192 Tenn. 251, 263, 241 S.W.2d 121, 125–26 (1951); *Tenn. Hoop Co. v. Templeton*, 151 Tenn. 375, 379–80, 270 S.W. 73, 75 (1925); *Sawyer v. Sawyer*, 106 Tenn. 597, 603, 61 S.W. 1022, 1023 (1901); *Bailey v. Bailey*, 27 Tenn. (8 Hum.) 230, 233 (1847); RESTATEMENT (SECOND) OF CONTRACTSS § 155 cmt. c, at 410.
>
> An important subcategory of mistake is mistake in the expression, or integration, of the agreement. *Jones v. Jones*, 150 Tenn. at 595, 266 S.W. at 121; *Alexander v. Shapard*, 146 Tenn. at 106–07, 240 S.W. at 291; RESTATEMENT (SECOND) OF CONTRACTS ch. 6 introductory

note, at 379, 381, § 155 & cmt. a, at 406–07. A mistake in expression occurs where one or both parties to a written contract erroneously believe that the contract embodies the agreement that both parties intended it to express. In such cases, the courts may adjust the provisions of the written contract to make it express the true agreement reached by the parties. *Alexander v. Shapard*, 146 Tenn. at 107, 240 S.W. at 291; 27 WILLISTON ON CONTRACTS § 70:20, at 257.

In order to obtain reformation on the basis of mistake in expression, a party must present clear and convincing evidence that: (1) the parties reached a prior agreement regarding some aspect of the bargain; (2) they intended the prior agreement to be included in the written contract; (3) the written contract materially differs from the prior agreement; and (4) the variation between the prior agreement and the written contract is not the result of gross negligence on the part of the party seeking reformation. 7 CORBIN ON CONTRACTS § 28.45, at 283; 27 WILLISTON ON CONTRACTS §§ 70:19, at 256, 70:23, at 264–65. Reformation is not automatically barred simply because one of the parties denies that there was an antecedent agreement or claims that the mistake was not mutual.

As long as the party seeking reformation establishes the elements of a mistake in expression, any discrepancy between the parties' prior agreement and their written contract is presumed to be the result of a mutual mistake . . . . *Alexander v. Shapard*, 146 Tenn. at 108, 111, 240 S.W. at 292–93.

*Sikora*, 212 S.W.3d at 287–88 (footnotes omitted).

Because mutual mistake justifying reformation must be proven by clear and convincing evidence, the typical Rule 13(d) standard of review is somewhat altered. In this situation, we "presume[] the trial court's underlying factual findings are correct (unless the evidence preponderates against them), and then determine[] *de novo* whether these facts establish [the claim] by clear and convincing evidence." *Reid ex rel. Martiniano v. State*, 396 S.W.3d 478, 515 (Tenn. 2013) (citing Tenn. R. App. P. 13(d); *In re Bernard T.*, 319 S.W.3d 586, 596–97 (Tenn. 2010)). "For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect." *Spann v. Am. Exp. Travel Related Servs. Co.*, 224 S.W.3d 698, 707 (Tenn. Ct. App. 2006) (citing *Walker v. Sidney Gilreath & Assocs.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000)). A trial court's findings regarding the above four elements of mutual mistake are findings of fact. *See Eatherly Const. Co. v. HTI Mem'l Hosp.*, No. M2003-02313-COA-R3-CV, 2005 WL 2217078, at *13 (Tenn. Ct. App. Sept. 12, 2005) ("The Chancellor's finding of no mutual mistake comes to this court with a presumption of correctness unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d)."); *Williams v. Botts*, 3 S.W.3d 508, 510 (Tenn. Ct. App. 1999) ("The evidence preponderates in favor of

the Trial Court's conclusion [that there was no mutual mistake].").  Thus, while we will affirm the trial court's findings as to those four elements unless the evidence preponderates otherwise, the trial court's overall conclusion that Appellee is entitled to reformation is reviewed *de novo*.

In arguing that the profit share award was a ten percent interest in the profits that would be realized by Adenus only upon the sale of the company, Appellant points to the plain language of the Plan and Award Agreement. Specifically, it cites section 4(a) of the Plan, which states in part that a profit share "shall entitle its holder to a share of the profits realized by the Company upon the sale of all or substantially all of its assets." In claiming that Appellee forfeited his profit share when his employment was terminated, Appellant further points to section 4(f) of the Plan, which states that "[i]f a Participant who is granted a Profit Share ceases to provide Services to the Company or its Subsidiary Entities for any reason whatsoever, such Participant shall forfeit his Profit Share without further action by or additional consideration from the Company."[15] Appellant additionally cites section 3(b)(i) of the signed Award Agreement, which states that "[i]f Employee Member ceases Continuous Service for any reason, or no reason, with or without Cause ("Service Termination"), then . . . [t]he Employee Member will forfeit such Employee Member's entire vested and unvested Profit Share." Appellant also relies on Tennessee law for the proposition that when a party has been provided with clear and express notice of a potential forfeiture, forfeitures provisions are enforceable. *Cf. 1963 Jackson, Inc. v. De Vos*, 436 S.W.3d 278, 291–92 (Tenn. Ct. App. 2013) (concluding that a notice letter sent to a lessee was legally insufficient to permit forfeiture of the lease because it did not put lessee on notice that waste was a default event that could result in termination of the lease).

Beyond the plain language of the various documents at issue, Appellant also points to Charles's testimony regarding the parties' negotiation. For example, Appellant relies on Charles's testimony that he would not have presented to the board the signed version of the Award Agreement for approval if it did not contain what the parties had agreed on; Adenus never would have agreed to an Award Agreement that included a sale or repurchase option; and the wrong version of the Award Agreement was not presented to Appellee for execution. Appellant argues that the board meeting minutes do not reflect any discussion or approval of a sale or repurchase option in the Award Agreement. Rather, the only time those provisions appear is in the "Definitions" section of the Plan. Appellant also points to Section 5(b) of the Award Agreement, which provides that the interpretations and constructions shall be conclusively made by the board.  So, Appellant contends that these facts demonstrate that the executed Award Agreement was properly reflective of the parties' mutual understanding and that reformation was therefore not available simply because Appellee hoped to enter into a different agreement.

---

[15] The parties and the trial court concern themselves with an exception to the forfeiture provision which appears in section 3(c) of the Award Agreement. Given our disposition of the appeal, *infra*, we do not find it necessary to address this provision.

Appellee does not dispute that the parties' executed Award Agreement, considered alone, does little to support his position. Instead, he argues that the trial court properly considered the totality of the circumstances, including the marked-up Plan, the testimony, and the confusion surrounding the execution of the agreement to conclude that the parties' executed contract should be reformed. To support his argument, Appellee claims that forfeiture of his profit share would render the vesting schedule meaningless. Likewise, because the Plan and the Award are to be read together, Appellee asserts that the inclusion of the sale option in the Plan and not in the Award Agreement would not make sense and would render the sale option language in the Plan surplusage. Appellee points out that the inclusion of the sale and repurchase options were the only material changes to the Plan and Award Agreement after Charles emailed the initial drafts to him on June 27 and June 30, and there is no proof that those terms were subsequently removed or rejected by the board. Further, Appellee claims that his changes to the Plan and the Award Agreement were consistent with the changes to the Plan announced at the July 15 board meeting and with Charles's notes. Appellee emphasizes the trial court's reliance on the fact that Adenus maintained up until trial that the Plan did not include the sale and repurchase options, and then conceded that it did include those terms. Appellee further avers that there is no written documentation or correspondence contemporaneous to the negotiation and approval process in 2008 that supports Charles' testimony at trial.

In order to resolve this dispute, we must consider whether the trial court erred in applying the doctrine of reformation. *See **Sikora***, 212 S.W.3d at 287–88. We therefore begin with the first two elements—whether the parties reached a prior agreement that they intended to be included in their written agreement—as these are the elements most in dispute in this case. ***Id.*** We conclude that the evidence does not preponderate against the trial court's finding that the parties had reached a prior agreement that was mistakenly not contained in the executed Award Agreement.

Here, the undisputed evidence demonstrates that Appellee emailed the July 1 version of the Award Agreement to Charles, which included the sale and repurchase options, and stated, "Let me know if any additional changes need to be made." There is no evidence of a reply email or other discussion after that where the sale and repurchase options were intentionally removed. Indeed, Charles could not definitely state that any other negotiations had taken place that intentionally removed the sale and repurchase options following July 1. Based on this proof, the trial court explicitly credited Appellee's testimony that there were no further discussions materially altering the agreement between the parties after this date. "We afford great deference to the trial court's assessment of the credibility of the witnesses, and we will not reassess factual findings based on witness credibility unless clear and convincing evidence supports a different finding." ***Coleman Mgmt., Inc. v. Meyer***, 304 S.W.3d 340, 348 (Tenn. Ct. App. 2009). Particularly in light of Charles's inability to specifically dispute Appellee's testimony on this issue, the trial court did not err in finding that this email was the last discussion concerning the terms at issue.

Still, silence is generally insufficient to constitute acceptance of an offer and thereby bind a party to a contract. *See, e.g.*, **Westfall v. Brentwood Serv. Grp., Inc.**, No. E2000-01086-COA-R3-CV, 2000 WL 1721659, at \*5 (Tenn. Ct. App. Nov. 17, 2000) (citing **Smith v. Murray**, 311 S.W.2d 591, 595 (Tenn.1958)) (stating, in the context of a non-disclosure/non-competition agreement between an employer and employee, that "silence or inaction generally does not constitute acceptance of an offer, unless the circumstances indicate that such an inference of assent is warranted."). In this case, however, there is more than silence to support the conclusion that Appellee and Charles, who was acting on behalf of Adenus, agreed that the sale and repurchase options would be included in the Award Agreement.

For example, even Adenus eventually conceded that the Plan includes definitions of "sale option" and "repurchase option." Adenus is correct that those are only definitional provisions but, nevertheless, "[i]n construing a contract, the entire contract should be considered in determining the meaning of any or all its parts." **Cocke Cnty. Bd. of Highway Comm'rs v. Newport Utilities Bd.**, 690 S.W.2d 231, 237 (Tenn. 1985) (citation omitted). Here, the parties agree that the Plan controls in the event of an inconsistency between the Plan and Award Agreement. But to adopt Appellant's position would be to render the inclusion of the terms ""sale option" and "repurchase option" in the Plan meaningless, as they are only relevant and operational under the version of the Award Agreement proffered by Appellee. Tennessee law generally provides that contracts should not be interpreted in ways that render portions meaningless. *See* **Maggart v. Almany Realtors, Inc.**, 259 S.W.3d 700, 704 (Tenn. 2008) ("The interpretation should be one that gives reasonable meaning to all of the provisions of the agreement, without rendering portions of it neutralized or without effect."). So the fact that these definitions are included in the Plan agreed to by the parties certainly lends support for the trial court's finding that the parties had agreed to a version of the Award Agreement that actually employed these terms, rather than one in which the terms were mere surplusage.[16]

We also agree with the trial court's finding that Adenus' inability to correctly identify the operative Plan up until trial is circumstantial evidence of the fact that "the process of executing the definitive Award Agreement was plagued with administrative chaos culminating in the parties signing an incomplete preliminary draft rather than a complete version containing all of the terms and conditions approved by the Board." Additionally, to the extent that Appellant argues that the Award Agreement dictates that the board's interpretations of the relevant provisions are to be binding, it only addresses this issue in a skeletal manner. *See* **Sneed v. Bd. of Pro. Resp. of Supreme Ct.**, 301 S.W.3d 603, 615 (Tenn. 2010) ("It is not the role of the courts, trial or appellate, to research or

---

[16] We also emphasize that Charles's handwriting on the marked-up version of the Plan—especially the notation apparently indicating the addition of the sale and repurchase options—demonstrates that Charles had awareness of the sale and repurchase options and their significance. This lends support to the trial court's conclusion that those terms were also intended to be in the Award Agreement.

construct a litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived."). Appellant argues, however, that the trial court's reformation does not properly take into account other language of the Plan, such as a more general forfeiture provision, stating that "[i]f a participant who is granted a Profit Share ceases to provide Services to the Company . . . for any reason whatsoever, such Participant shall forfeit his Profit Share without further action by or additional consideration from the Company." But the reformed version of the Award Agreement (the July 1 version) only applies forfeiture to *unvested* profit share, stating, "If the Employee Member ceases Continuous Service for any reason, or no reason, . . . [t]he Employee Member will forfeit such Employee Member's entire unvested Profit Share." The reformed Award Agreement further allows Appellee to exercise the sale option upon termination, with respect to his vested profit share—meaning that vested profit share clearly could not be automatically forfeited upon termination. In a contract, where there are "both general and special provisions relating to the same thing, the special provisions control. Thus, where there is uncertainty between general and specific provisions, the specific provisions ordinarily qualify the meaning of the general provisions, although this is not universally or necessarily so." *Newport Utilities Bd.*, 690 S.W.2d at 237. Here, the forfeiture provision in the reformed Award Agreement and the language applying the sale option even in the event of a termination are clearly more specific than the Plan's general forfeiture provision. Therefore, the more specific provisions of the reformed Award Agreement control. *See id.* The parties agree that Appellee was fully vested, having been at the company much longer than sixty months. Consequently, under the reformed Award Agreement, Appellee did not forfeit his vested profit share when his employment was terminated, and he had the right to exercise the sale option with respect to his vested profit share.[17]

As for Appellant's argument that the profit share was contingent on a sale of the company, we agree that there is language in the relevant documents indicating that a sale of the company was a precondition of the profit share. However, there is also language suggesting a sale was not necessary for Appellee to receive his profit share. For example, in the reformed Award Agreement, section 3(e) explains how the company is to pay an employee his profit share "[i]n the event of a termination of Continuous Service." It explains in part that "[i]f the Compan[y] issues its note to the Employee Member, the note shall be payable over three years in equal monthly installments . . . [and] shall be payable upon a Disposition Event *if* such event occurs prior to the final installment." (Emphasis added). The necessary implication of this language is that the profit share could be fully paid out to the employee before a disposition event, or sale of Adenus, even occurred. Additionally, it bears repeating that the sale option language (of both the Plan and the

---

[17] According to the Award Agreement, the sale option applies "[i]f the Service Termination is for Good Reason." Neither party discusses or makes any arguments about what constitutes "Good Reason," nor is it defined in the Award Agreement, Plan, or Employment Agreement. Therefore, we assume that Appellee's termination constituted termination "for Good Reason."

reformed Award Agreement) simply states that an employee who is terminated (for Good Reason) has the right to require the company to purchase his vested profit share. Nothing in the sale option mentions the sale of the company as being a precondition to an exercise of the sale option. While Appellee played a role in drafting the agreements in this case, Charles, on behalf of Adenus, was the primary drafter. Thus, the ambiguities regarding whether a sale of Adenus was necessary before a profit share would be awarded are to be construed against Adenus. *See, e.g.*, **Jackson v. Miller**, 776 S.W.2d 115, 117 (Tenn. Ct. App. 1989) (citing **Reliance Ins. Co. v. Olsen**, 678 S.W.2d 59, 61 (Tenn. 1984)) ("Ambiguous language in a contract is construed against the drafter."). Given the totality of the circumstances, we cannot conclude that the evidence preponderates against the trial court's finding that the first two elements support reformation based on mutual mistake in this case.

Regarding the third element of reformation based on mutual mistake—whether the written agreements materially differ from the parties' prior agreement, *see* **Sikora**, 212 S.W.3d at 288—the trial court concluded that the omission of the sale and repurchase options "from the [] signed Award Agreement materially prejudices the parties because it leaves them [] with no procedural means to liquidate or buy-out the other party in the event that [Appellee's] employment was terminated once he fully vested in the profit share." Rather than material prejudice, the more precise inquiry for this element is whether "the written contract materially differs from the prior agreement." *Id.* The signed version of the Award Agreement undoubtedly differs materially from the prior agreement to allow for sale and repurchase options, because by excluding those options, the signed version namely prevents Appellee from being able to require Adenus to purchase his profit share upon his termination, depriving him of a significant amount of money. The evidence therefore does not preponderate against the trial court's finding that this element supports Appellee's claim of reformation based on mutual mistake.

Finally, we consider the fourth element,—whether the variation between the prior agreement and the written contract is the result of Appellee's gross negligence. *See* **Sikora**, 212 S.W.3d at 288. In this case, Appellee admitted that he did not read the executed version of the Award Agreement before signing it. Generally, parties will not be saved from their own such failures. *See, e.g.*, **Beasley v. Metro. Life Ins. Co.**, 190 Tenn. 227, 232, 229 S.W.2d 146, 148 (1950) (quoting 17 C. J. S., Contracts, § 137, pages 489, 490) ("'[O]ne is under a duty to learn the contents of a written contract before he signs it, and [] if, without being the victim of fraud, he fails to read the contract or otherwise to learn its contents, he signs the same at his peril, and is estopped to deny his obligation, will be conclusively presumed to know the contents of the contract, and must suffer the consequences of his own negligence.'"). However, as this Court has previously explained,

> It would make little sense to impose a categorical exemption to the doctrine of mistake whenever the underlying mistake could accurately be described as resulting from "inattention" as opposed to some other cause. If

inattention were enough to defeat a claim for reformation based on a mistake in expression, the remedy would almost never be available to correct typographical mistakes and scriveners errors, because parties have a duty to read the written contracts they enter into and are ordinarily charged with knowledge of their contents regardless of whether they have actually read them. Accordingly, reformation is denied only in "extreme cases" where a party's fault "amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing." Thus, the level of negligence required to defeat a claim for reformation based on a mistake in execution is often described as "gross negligence." A party's failure to catch a drafting error when reading over a written contract does not normally rise to the level of "gross negligence" that will bar reformation. This is true even where the party seeking reformation is the one who drafted the contract.

*Sikora*, 212 S.W.3d AT 289–90 (footnote and citations omitted); *see also **Rentenbach Eng'g Co., Const. Div. v. Gen. Realty Ltd.***, 707 S.W.2d 524, 527–28 (Tenn. Ct. App. 1985) ("[I]f mere negligence precludes relief, very few if any instruments could be reformed on the ground of mutual mistake, because if a party uses due care in reading an instrument he would never sign one which did not contain the parties' agreement.").

In a different context, this Court has described the difference between simple negligence and gross negligence thusly:

Gross negligence is a manifestly smaller amount of watchfulness and circumspection than the circumstances require of a person of ordinary prudence. It falls short of being such reckless disregard of probable consequences as is equivalent to a willful and intentional wrong. Ordinary and gross negligence differ in degree of inattention, while both differ in kind from willful and intentional conduct which is or ought to be known to have a tendency to injury.

Proof of gross negligence depends upon the facts and circumstances of each particular case.

*Fellows v. Sexton*, 46 Tenn. App. 274, 281–82, 327 S.W.2d 391, 394 (Tenn. 1959) (quoting *Alspaugh v. Diggs*, 195 Va. 1, 5, 77 S.E.2d 362, 364 (Va. 1953)) (internal citations and quotation marks omitted). Appellant cites nothing in the record to indicate that Appellee's failure in this case amounts to anything more than simple inattention. Therefore, and given the above discussion, the evidence does not preponderate against the trial court's finding that Appellee's failure to execute the correct version of the Award Agreement was not a result of his gross negligence.

Here, the evidence does not preponderate against the trial court's findings as to any of the four elements of mutual mistake justifying reformation, all of which support Appellee's assertion that the parties' contract should be reformed. Because each of the four elements support reformation in this case, we conclude that Appellee presented clear and convincing evidence to support his claim that the agreement should be reformed on the basis of a mutual mistake. Consequently, the trial court did not err in reforming the Award Agreement on the basis of mutual mistake, and thus in determining that Appellee had a right to exercise the sale option of his vested, non-forfeited profit share. The trial court likewise did not err in determining that Appellant was in breach by failing to buy Appellee's profit share, and by ordering Appellant to pay Appellee for the profit share. Given our decision regarding reformation of the Award Agreement, we need not address the trial court's alternative holding or any other portion of the trial court's order applicable in the event the Award Agreement was not reformed to include a sale option.

### iii.

Next, we address Appellant's argument that trial court did not correctly value Appellee's profit share interest. Appellant avers, inter alia, that even assuming Appellee had an exercisable sale option, there was no proof at trial of fair market value as of December 31, 2018 or December 31, 2019. Rather, Appellant contends that the only evidence of the fair market value of Adenus was Exhibit C, which was the fair market value as of December 31, 2008, and the 2017 and 2018 Adenus tax returns introduced in evidence do not reflect fair market valuations of Adenus' assets, but only the only book value. Appellant claims that $298,372.00 was the "Ending Capital Account" balance for Appellee as of December 18, 2018, and, pursuant to Mr. Hallum's testimony, a capital account reflects the pass through of profits and losses to owners of pass through entities— accordingly, there was no evidence at trial on which to base the award of $298,372.00 to Appellee. Because damages are a required element of Appellee's claim for breach of the sale option, Appellant argues that Appellee had the burden at trial of proving his alleged damages.

Appellee argues that pursuant to the Award Agreement, if there is a termination of employment, the purchase price is based on the fair market value of the profit share less the base amount of the profit share determined as of 2008, which was in Exhibit C. He contends that he entered in evidence the annual tax information provided to him by Adenus that showed the book value of the profit share, as reported to the Internal Revenue Service on Appellee's K-1 tax form. Appellee further asserts that Appellant's accountant testified at trial that book value as reported on the tax return often understates actual fair market value, and thus if anything, he understates the true fair market value of the company as of December 31, 2018. But Appellee states that he is willing to accept the reduced valuation of his profit share to achieve finality.

While Appellant takes issue with the evidence of the fair market value that Appellee introduced, Appellant has not itself offered any countervailing evidence establishing the correct value. In another case regarding a "dispute . . . over [a] trial court's factual conclusions regarding the fair market value of [] property," this Court explained that "[d]eterminations concerning the amount of damages are factually driven. Thus, the amount of damages to be awarded in a particular case is essentially a fact question." *BancorpSouth Bank, Inc. v. Hatchel*, 223 S.W.3d 223, 228 (Tenn. Ct. App. 2006) (quoting *Beaty v. McGraw*, 15 S.W.3d 819, 827 (Tenn. Ct. App. 1998), *abrogated on other grounds* (citations omitted)). Furthermore, "[o]n appeal, the appellant has the burden of demonstrating that the evidence presented at trial actually preponderates against the trial court's findings of fact." *Id.* at 229 (citations omitted). Therefore, without providing evidence to dispute Appellee's fair market value calculation, Appellant has not demonstrated that the evidence preponderates against the trial court's finding that $298,372.00 is a fair calculation of the amount Appellee is owed. *Cf. Wallace v. Wallace*, 733 S.W.2d 102, 107 (Tenn. Ct. App. 1987) (stating, in a divorce case, that "the burden is on the parties to produce competent evidence of value, and the parties are bound by the evidence they present," and affirming the trial court's valuation of property where a husband had "offered no admissible proof to the contrary that the trial court found credible."). Therefore, the trial court's assessment of the judgment owed to Appellee, including costs, attorney's fees, and pre- and post-judgment interest, is affirmed.

**iv.**

Finally, we note that in the body of his brief, Appellee requests that Adenus be ordered to pay interest and attorney's fees incurred since the trial court issued its ruling. However, Appellee does not specifically designate this argument as an issue on appeal. "[A]n issue may be deemed waived when it is argued in the brief but is not designated as an issue in accordance with Tenn. R. App. P. 27(a)(4)." *Hodge v. Craig*, 382 S.W.3d 325, 335 (Tenn. 2012) (citations omitted). Therefore, due to Appellee's failure to designate his request for attorney's fees and interest as an issue on appeal, such request is waived.

**CONCLUSION**

The judgment of the Williamson County Chancery Court is affirmed, and this case is remanded to the trial court for further proceedings consistent with this Opinion. Costs of this appeal are taxed to Appellant Adenus Group, LLC, for which execution may issue if necessary.

s/ J. Steven Stafford
J. STEVEN STAFFORD, JUDGE